Powers v. Commonwealth. (2d Trial.)

---

CASE 32—PROSECUTION AGAINST CALEB POWERS AS ACCESSORY BEFORE THE FACT TO THE MURDER OF WILLIAM GOEBEL.—DEC. 3.

# Powers v. Commonwealth. (2d trial.)

APPEAL FROM SCOTT CIRCUIT COURT.

DEFENDANT CONVICTED OF MURDER AND APPEALS. REVERSED.

DISQUALIFICATION OF TRIAL JUDGE—SUFFICIENCY OF AFFIDAVIT—CONSPIRATORS—STATEMENTS OF—COMPETENCY—INTIMIDATION—POLITICAL PLOT—ARMED FORCES—MILITIA—IMPEACHMENT OF WITNESS—POSTPONEMENT OF TRIAL—ADMISSION OF AFFIDAVIT AS DEPOSITION OF ABSENT WITNESS—COMPULSORY PROCESS—CORROBORATION OF CO-CONSPIRATORS—PEREMPTORY INSTRUCTION.

Held: 1. Kentucky Statutes, section 968, provides that, if either party shall file his affidavit that the judge will not afford him a fair and impartial trial, the judge shall vacate the bench for that case, in favor of an attorney to be selected to try the cause. HELD, that where an affidavit states that the judge will not give the litigant a fair and impartial trial, and sets out as the basis of such belief facts such as would prevent an official of personal integrity from presiding in the case, or from affording a fair and impartial trial, it must be assumed that such facts are true, and the judge must accordingly vacate.

2. Defendant, having been indicted as an accessory before the fact of a murder alleged to have been committed as a part of a political conspiracy, filed his affidavit that the judge was a member of the same political party as deceased, and was his intimate personal friend, and in close sympathy with him in the

114 237
d120 542

114 237
f126 446

114 237
133 99

114 237
138 243

Powers v. Commonwealth. (2d Trial.)

political imbroglio resulting in the assassination; that by reason thereof, and of the great excitement at the time of the assassination, the judge had conceived a feeling of hostility against defendant which would prevent him from affording a fair and impartial trial of the case; that at a former trial the judge had shown his hostility by specific acts,—especially in the selection of an unfair and prejudiced jury. HELD, that sufficient was alleged to require the judge to vacate the bench on motion under Kentucky Statutes, section 968.

3. Defendant was charged with being an accessory before the fact of murder, and it was sought to show that a large body of citizens who were assembled at the State capital by the instigation of defendant and others were there to intimidate by force the Legislature while acting as the triers of certain election contests, and that in execution of such purpose the murder was committed. HELD, that testimony as to what members of the party said and did while at the capital was competent.

4. Testimony as to an occurrence at a dinner, where one of the party assembled at the capital "sweetened his coffee with a forty-four," was competent.

5. Statements by others at the capital, not shown to have been acting with the accused, or with others indicted with him, were not competent against defendant.

6. The fact that persons visited the statehouse square during the contest proceedings, and had access to those jointly indicted with defendant was not sufficient to connect them with the alleged plot, so as to render admissible against the defendant statements made by them.

7. The fact that witnesses had information which led them to believe that deceased would be assassinated did not prove or tend to prove them parties to the alleged conspiracy, so as to make statements made by them in regard to such information admissible against defendant.

8. Telegrams sent immediately after a murder by a defendant on trial as an accessory before the fact or by those jointly indicted with him as co-conspirators, or by those acting under the authority of such alleged conspirators, were relevant as against defendant.

9. Where it was the theory of a prosecution of an alleged accessory before the fact of the murder of a contestant for the office of governor that the murder was a part of a political plot to intimidate the Legislature, as the trier of an election contest involving the governorship, and where the acting governor was indicted jointly with the defendant, acts and telegrams of the acting governor, as head of the military department, and of the

Powers v. Commonwealth. (2d Trial.)

military department in general, which reasonably appeared to have been connected with the killing, were admissible against defendant.

10. The words "all right," in telegrams sent directly after the assassination, though having an apparently plain meaning, may, when they constitute a military telegram, be shown by parol to have been used as a part of a cipher code, and to have a meaning different from their face.

11. Where certain letters written by one charged with a crime were introduced against him, it was not competent for him, in his testimony, to explain unambiguous expressions therein.

12. The fact that adherents of a defendant charged with a crime, over whom he had no control, so treated one who testified against him at his first trial as to compel the witness to move away from the vicinity, was not material against defendant at his second trial.

13. Evidence was not admissible on the trial of one accused of being accessory before the fact of murder as to what he said several minutes after he knew of the murder.

14. It was the theory of a prosecution of an alleged accessory before the fact of the murder of a contestant for the office of governor that the murder was a part of a political plot to intimidate the Legislature, as the trier of an election contest involving the governorship. The acting governor was indicted as a co-conspirator with defendant, and the prosecution was permitted to prove the use of the militia by him immediately after the murder. HELD, that it was permissible for the defense to prove, as a reason for such use, that angry and excited crowds were gathering about the executive building, threatening the occupants thereof with violence.

15. While it was permissible for the defense to prove, as a reason for being prepared with the militia, that they had knowledge of armed forces which assembled near the statehouse for the purpose of forcibly ejecting the acting governor and others from their offices, a mere rumor to that effect was properly rejected.

16. Proof of a statement made by a witness out of court, tending to impeach his credibility as a witness, should be admitted.

17. The proper method of impeaching a witness on the ground of the commission of a felony is by proof of conviction therefor.

18. Those who have been indicted as accomplices in the crime for which a defendant is being tried are competent witnesses against him, though the charge against them has not been dismissed; such fact going only to the credibility and weight of their evidence.

19. C., a witness for the defense in a criminal action, heard G., a witness for the prosecution, make certain statements affecting G.'s credibility. HELD, that it was immaterial that C. on the same occasion loaned money to G.'s brother-in-law.

20. A letter suggesting that the Commonwealth's attorney be apprised that the writer' was in possession of information against one jointly indicted with defendant as an accessory before the fact of murder, and a later letter requesting the destruction of the first one, were immaterial, as against defendant, though the testimony of the writer was material, and was used against him.

21. A mandate of reversal of a criminal case was filed with the clerk of the circuit court more than ten days prior to the term of court next succeeding reversal, and notice given defendant that the case would be urged for trial at such term. When court convened, the filing was noted of record. HELD that, the time given defendant for preparation being reasonable, nothing to the contrary being shown, the case would stand for trial at that term of court, though there was no authorization for the filing of the mandate before term time.

22. Cr. Code Prac., section 189, as amended by Act May 15, 1886, provides that a continuance may be refused in criminal cases, despite the absence of defendant's witnesses, without admitting everything as true which is stated as the expected testimony of the absent witnesses in the affidavit for continuance, but that such affidavit must be read as their depositions. Bill of Rights, par. 11, provides that the accused in a criminal prosecution shall have the right to compulsory process for his witnesses. HELD, that the trial of a criminal action can be forced on defendant, though some of his witnesses are absent, where he has been furnished the compulsory process of the court to secure their attendance, and where the affidavit for continuance on account of their absence is allowed to be read as their depositions.

23. The supreme court, when it is not advised as to the condition of the docket of the circuit court, can not hold a refusal of a motion to discontinue night sessions to have been an abuse of the circuit court's discretion in that regard.

24. Where in a criminal action there was evidence which, if given full credit, tended to corroborate the evidence of those charged as co-conspirators with defendant, and to establish his guilt, it was not error to refuse a peremptory instruction to find for the defendant.

25. Under Cr. Code Prac., section 281, providing that decisions upon

challenges to the panel are not subject to exception, the supreme court has no jurisdiction of an objection to the panel.

26. Where defendant was charged with being an accessory before the fact of a murder alleged to have been a part, or result of a conspiracy, an instruction in regard to acts done in pursuance of a conspiracy "to do some unlawful act" should have further informed the jury what would have been such an unlawful act, under the law and the evidence.

ON PETITION FOR REHEARING:

27. While no provision is made in sections 356, 357, 358, 359 and 360, Criminal Code, regulating appeals, for a rehearing by the defendant in a felony case, and except in cases expressly provided for by statute, a rehearing is not a matter of right, we are of the opinion that this court has, by virtue of its appellate jurisdiction in such cases, power to suspend the issual of the mandate and rehear the case during the term at which it is tried. But if the power is not exercised during the term, the decision becomes final and this court has no jurisdiction at a subsequent term to retry the appeal.

J. R. MORTON, J. C. SIMS AND FENNELL & SON, FOR APPELLANT.

T. C. CAMPBELL, R. B. FRANKLIN, T. B. SEBREE, JOHN K. HENDRICK, B. G. WILLIAMS, VICTOR BRADLEY, L. W. ARNETT, EARL ASHBROOK AND DENNIS DUNDON, FOR THE COMMONWEALTH.

No brief is on file for the appellant and, as the brief of Mr. T. C. Campbell for appellee is altogether in response to the brief of appellant, it is not deemed proper to give his argument especially as it is not accompanied with an abstract of his points and citations.—REPORTER.

OPINION OF THE COURT BY JUDGE O'REAR—REVERSING.

Appellant, Caleb Powers, was indicted by the grand jury of Franklin county, charged with being an accessory before the fact to the murder of William Goebel. On a change of venue in Scott county, he has been twice tried and convicted. On this appeal, numerous questions of law are presented, some of which were considered by the court on the former appeal. 22 R., 1807; 61 S. W., 735; 53 L. R. A., 245. Others now presented do not appear to have been raised, or at

least not passed upon by the court. We do not feel that it would be profitable, or even possible, within reasonable range, to set forth all the facts proven by each side upon the trial. To allow an intelligent understanding of the propositions herein decided, we give a general statement, only, of the facts of the case, and the contentions of the prosecution and of the defense.

The murdered man, William Goebel, was at the time of his death a senator of this Commonwealth, and had lately been engaged in a canvass, as the nominee of his party, for the high office of governor of the Commonwealth. His opponent at the general election held November, 1899, was William S. Taylor, then attorney general of Kentucky. Senator Goebel had attained a commanding eminence and influence in his party—being a leader of great ability, with attributes of most positive and forceful character. These qualities enlisted a devoted following. After one of the most exciting, intense campaigns, the returns of the election showed Taylor's election, and that of all the other State officers on the ticket with him. The Legislature elected at the same time, however, was of the same political faith as Mr. Goebel; a majority of each house being in political accord with him and his supporters. Under the then law, it was provided that a central board of election commissioners should try all contests over State offices, except those of governor and lieutenant governor, which were to be tried by the Legislature. Certificates of election were awarded the Republican candidates. Notices of contest were directly served on all of them. The Legislature which was to try the contest over the offices of governor and lieutenant governor, met 1st of January, 1900. The grounds of contest attacked the validity of the election as held in a number of counties that had given large Re-

Powers v. Commonwealth. (2d Trial.)

publican majorities, based mainly upon an allegation that
the official ballots used were thinner than they should have
been. The bitterness engendered by the campaign, aggra-
vated by grave charges and countercharges, was thus kept
up, and, indeed, apparently augmented. True, appeals
were also being made to what was thought to be better
reason and patriotism. It appeared that some thought
the emergency so grave as to make necessary the consid-
.eration of revolution. Whether grounds actually existed
for all this is not now so material, as whether they ap-
peared to, and were in fact by many actually believed to,
exist. The capital was the center of attention, and the
events transpiring were the subject of earnest thought.
Naturally and necessarily, many witnesses for each of the
contestants were called there. Incidentally many people
came, also, whether out of curiosity or interest, or sympa-
thy with one side or the other of the litigants. Appellant
contends that it came to his ears, and to the attention of
the other State officials, that their opponents and their
adherents intended summarily taking possession of the
offices upon a favorable decison by the boards and bodies
having these cases in hand, without process of law or the
judgment of the courts. Whether in fact such a purpose
had been formed was not shown at the trial. Of the many
expedients resorted to by those in office to influence the
action of the triors of these cases, appellant contends that
it was determined by him and his colleagues, or at least
some of them, to have large bodies of citizens from various
sections of the State meet at Frankfort, petition the Leg-
islature as to their rights, and remonstrate against revers-
ing the will of the apparent majority, as expressed by the
official returns; thus exhibiting their interest, feeling and
wishes, in the hope that it would exert a moral influence

upon the conduct of those bodies. One notably large body
of citizens was brought to Frankfort on January 25, 1900,
through the efforts of appellant and some of those jointly
indicted with him in this case. For the prosecution it is
claimed that this crowd of people were brought to the
capital armed, to threaten, intimidate, and coerce the ac-
tion of the Legislature, and, if necessary to accomplish that
end, to kill some of the Democratic members, and especial-
ly Senator Goebel. The fact of the coming of this crowd,
variously estimated at from 500 to 1,200 people, and its
conduct, and its purpose in coming to Frankfort, form one
of the storm centers of this case. Some days after this
crowd, or the great majority of them, had returned to their
homes, and before the hearing of any of the contests had
been completed by the committees having them in hand, Sen-
ator Goebel was shot from ambush, on January 30, 1900,
as he was passing through the statehouse square on his
way to the capitol building, where the Senate was in ses-
sion, or was shortly to convene. From this wound he died
on February 3d following. It is reasonably certain from
the proof in the record that the fatal shot came either from
the executive building, or from its immediate vicinity. That
building was occupied by the officers of governor, secre-
tary of State, auditor, treasurer, superintendant of public
instruction, and bureaus of some of these offices. Appel-
lant had been upon the Republican ticket as the nominee
of that party for the office of secretary of State. He had
received the certificate of election, and had been commis-
sioned, and was in office. This office was one of those being
contested, not before the Legislature, but before the State
board of election commissioners. It was the effort of the
prosecution to prove, and there was a volume of testimony
introduced to the effect, that this fatal shot, and three

others that accompanied it, came from the office of the secretary of State, and that, although appellant was not at the time in Frankfort, yet that he knew of and was a party to the plot to assassinate Senator Goebel. Within a few minutes after the shooting (whether 5 or 10, or) as much as 30, there is great conflict of testimony), a company of the State guard appeared upon the scene, and were so stationed as to have under their protection the buildings upon the capitol square, and especially the executive building. Also within a few minutes telegrams were sent to the commanding officers of the State guard, calling them to Frankfort. During that day and the following as many as 1,000 of the State militia were under arms in Frankfort. Immediately after the shooting, Gov. Taylor issued a proclamation calling out the State guard. Great excitement prevailed in the city of Frankfort, and fears of a riot were entertained by the officials on the statehouse square, and others, it is claimed. Taylor is indicted jointly with appellant and others for the murder. Other facts bearing on the case, and some elaboration of those outlined above, may be necessary further along, in disposing of the legal questions presented for our decision by this appeal.

### The Indictment.

On the former appeal of this case the sufficiency of the indictment was carefully consdered by the court, and we were then of the opinion, and are now, that it is sufficient in form and substance. A further discussion of that point is not deemed necessary. See Powers v. Com., 22 R., 1807, 61 S. W., 735, 53 L. R. A., 245.

### Affidavit to Require the Circuit Judge to Vacate the Bench.

Upon the noting of record in the circuit court of the filing of the mandate of this court, on the former appeal,

appellant filed an affidavit to require the circuit judge to vacate the bench, and entered his motion to that effect, which was overruled. The judge presided at the trial. The sufficiency of that affidavit is now a question on this appeal.

While at the common law the judge was not disqualified from sitting in any case, only when he was personally interested in the subject-matter or result of a litigation, or was related to those so interested, by statute in this State a materially different rule has been adopted. The present statute on this subject (section 968, Kentucky Statutes) provides: "When, from any cause, the judge of the circuit court fails to attend, or being in attendance, can not properly preside in an action, proceeding or prosecution, pending in said court, or if either party shall file with the clerk of the court his affidavit that the judge will not afford him a fair and impartial trial, or will not impartially decide an application for a change of venue, the parties, by agreement, may select one of the attorneys of the court to preside on the trial, or hear the application, or hold the court for the occasion; and on their failure to agree upon an attorney, the attorneys of the court who are present and not interested, nor employed in the cause, shall elect an attorney of the court then in attendance, having the qualifications of a circuit judge, to hold the court for the occasion, who shall preside accordingly; and the judge so selected shall preside in all cases called during the term in the absence of the regular judge, or in which he can not preside, except in those cases in which the special judge can not properly preside. The election shall be held by the clerk, and in case of a tie, he shall give the casting vote. The person elected shall, during the period that he acts, have all the powers and be subject to all the respon-

sibilities of a circuit judge." The rulings of the trial court on this motion is one of the principal grounds for reversal relied upon in the argument. Questions of this nature are always unpleasant. By law they must first be addressed to the trial judge whom they affect. The anomaly is there presented of one sitting in judgment upon the trial of questions involving, if not his official integrity, certainly his official impartiality. He is required to pass upon them; that is, upon their legal sufficiency, not upon the truth of their statements. From this judgment an appeal lies. The discharge of this duty is necessarily both delicate and difficult. That the sufficiency of the affidavit in this case may be accurately tested, we will undertake a review of the state of the law of this State on that subject.

The common-law rule, formerly in effect here, has been stated. The first enlargement of the right of the litigant in this respect was by the statute of 1815, found in 2 Morehead & B., Kentucky Statutes, 1524, from which we quote: "Be it enacted by the General Assembly of the Commonwealth of Kentucky, that all suits (a) cognizable in any of the circuit courts of this Commonwealth, where either of the parties shall conceive that he, she or they will not receive a fair trial in the court where such suit is pending, owing to the interest or prejudice of any judge or judges of the said court, or the judges will not sit, or to the interest or prejudice of the clerk, sheriff or coroner, where the sheriff or coroner is a party, or to the undue influence of his, her or their adversary or adversaries, or to the odium which attends the said party, or that his, her or their cause of action or defense, though legal, is odious, it shall be lawful for the party so suspecting he, she or they will not receive justice in the court then sustaining the said suit, owing to the said causes, or any of them, at any

Powers v. Commonwealth. (2d Trial.)

time to petition a circuit judge, or the two assistant judges
of the circuit courts of this Commonwealth, . . . which
petition shall distinctly set forth the cause or causes why
such fear is sustained, and be supported by the affidavit
of the petitioner or petitioners." It was made the duty
of the circuit judge to whom such petition was presented,
supported by the affidavits required by the statute, to re-
move the cause by changing its venue to some other cir-
cuit. This application was not considered by the judge
against whom the objections were made, but by another
circuit judge. The only relief allowed to the litigant when
the judge before whom his case was triable was "interested
or prejudiced" was to obtain a change of venue from his
district in the manner provided in this statute. The law
continued so, and without an interruption by this court,
so far as we are advised, until the adoption of the Con-
stitution of 1850. The fourth article of that instrument
was devoted to the judicial department of the State gov-
ernment. The twenty-eighth section of that article pro-
vided: "The General Assembly shall provide by law for
holding circuit courts, when, from any cause, the judge
shall fail to attend, or, if in attendance, can not properly
preside." The Revised Statutes, which became effective
on July 1, 1852, carrying into effect the provisions of the
Constitution recently adopted, and, compiling the statute
law of the State into one system, by section 1, art. 13, c.
27, provided: "When, from any cause, the judge of the cir-
cuit court fails to attend, or, if in attendance, can not
properly preside in a cause or causes pending in such court,
the attorneys of the court who are present, shall select one
of its members then in attendance, to hold the court for
the occasion, who shall accordingly preside and adjudicate."
Other sections regulated the manner of the selection and

the compensation etc., of the special judges. By a subsequent amendment, approved March 9, 1854, attorneys for the parties to the litigation in which the special judge was to be selected were disqualified from voting for such special judge. By section 10, c. 13, Revised Statutes, a defendant in a criminal or penal prosecution, by filing his affidavit with the clerk, stating "that he verily believes the judge of the court where the same is pending will not afford him a fair and impartial trial," could have a substitute, to be selected by the members of the bar, who should try the case, or the motion for change of venue; and, if the defendant filed like affidavit against the substitute. the clerk of the court was required to select "three discreet, impartial housekeepers," to try, under their oaths, the question of the substitute's impartiality.

The first adjudicated case construing the right of a litigant to require the regular judge to vacate the bench upon the ground of his bias, for other cause than personal interest in the result of the litigation, or of kinship to some one so interested, is the celebrated case of Turner v. Com., 2 Metc., 619, decided in 1859. From the array of eminent counsel appearing in the case, and the high professional standing of the appellant, he having been a celebrated practitioner as an attorney at law of his day, the case was doubtless thoroughly presented and carefully considered. This court held that the provisions of the Constitution, supra, and of the Revised Statutes (chapter 27, art. 13), applied to a case when the personal hostility of the trial judge to one of the litigants made it improper for him to preside in the cause. The court said: "The Legislature certainly did not intend that any cause, however trivial or unimportant, should operate to disqualify a circuit judge, or render it improper that he should preside in

a case, but obviously meant that such cause should be a legal and substantial one." The affidavit in that case disclosed the following objections to the circuit judge: "(1) That he was personally hostile to appellant and had been so for years, and that, as appellant believed, he could not, because of such hostility, do him justice upon the trial of said case; and (2) that he had prejudged more than one question in the case to appellant's prejudice, and that wrongfully." The court held: "Our conclusion, therefore, is that they did constitute ample cause, rendering it improper for the circuit judge to preside in the case, or to make any order therein, after the objections were presented, further than was necessary to the selection of a special judge in the manner prescribed by law, who could preside and dispose of the case." The court in that case reached its conclusion as to the proper meaning of the general term "any cause," employed in the Constitution and statutes, by referring to the statutes, supra, concerning changes of venue, and applying the causes therein enumerated as those evidently contemplated by the convention and Legislature when they used the language under consideration.

Thus the law remained as expressed in the sections of the Constitution and Revised Statutes above quoted, as aided by the interpretation by this court in the case of Turner v. Com., supra, until the adoption of the General Statutes in 1873. Section 1 of article 7 of chapter 28 of that revision provides: "When from any cause the judge of the circuit court fails to attend, or, being in attendance, can not properly preside in an action, special proceeding, or prosecution pending in said court, or if either party shall file with the clerk of the court his affidavit that the judge will not afford him a fair and impartial trial, the parties by agreement may select one of the

attorneys of the court to preside on the trial and hold the
court for the occasion; and on their failure to agree upon
an attorney to try the cause, the attorneys of the court
who are present and not interested, nor employed in the
cause, shall elect an attorney of the court then in attend-
ance, having the qualifications of a circuit judge, to hold
the court for the occasion, who shall preside accordingly."
The practice under that section seems to have prevailed,
until 1889, of filing an affidavit of the litigant, in which
the affiant stated, in the terms of the statute, "that the
judge will not afford him a fair and impartial trial."    The
sufficiency of such an affidavit, and consequently the correct
interpretation of the General Statutes mentioned, was
presented to this court for determination in the case of In-
surance Co. v. Landram, 88 Ky., 433, 10 R., 1039, 11 S. W., 367,
592, decided at the January term, 1889. The court held that it
was necessary in such an affidavit that "the fact or facts
upon which the belief that the judge will not give the lit-
igant a fair tral  should and must be stated in the affidavit,
and they must be of such a character as shall prevent the
judge from properly presiding in the case." The court,
however, said further:   "We do not mean to say the state-
ment of the ground for belief must establish, if true, that
the judge is a corrupt official, but we do mean to adjudge
that such causes, and those of a like character, as have been
noticed, are not sufficient, and there must be some fact
stated, such as personal hostility of such a character, if
that ground is relied on, as would prevent an official of
personal integrity from presiding in the case; and of the
sufficiency of the affidavit the trial judge must determine,
and the question, if improperly decided, can be raised in
this court, as in other cases, if an appeal is taken." In that
case the affidavit against the judge was filed after many

preliminary motions had been passed upon, and some or all of the· issues joined by the pleadings, and in all probability after the circuit judge had indicated by his rulings in these matters the inclination of his mind as to the law applicable to the case on trial.    From the illustrations used by the court in its opinion, it may be inferred that litigants were abusing the privilege accorded by this statute after they had tested the trial court's .views concerning the law of their cases by preliminary motions.   In the case of. Turner v. Com., the court .had under consideration a statute using the· term "·when from any cause" the judge could not properly preside etc.   "They found that the Legislature must have intended that the causes for which the judge would be required to vacate the bench was one of those provided for a change of venue.   In the General Statutes, however, not only is the same language used as was in the Revised Statutes, but there was added these words, "or if either party shall file with the clerk of the court his affidavit that the judge will not afford him a fair and impartial trial."   The construction given this section of the statute in the Landram case was a strict one.   It was the opinion of the court that the Legislature could not have contemplated putting it in the power of the litigant to virtually impeach the regular judge without cause or reason; that it was a right of the other party to the litigation to have his case tried by the regular judge, unless for proper and sufficient reasons he was disqualified.   In Vance v. Field, 89 Ky., 178, 11 R., 388, 12 S. W., 190, decided at the September term, 1889, the sufficiency of a similar affidavit was under consideration ·again.   Insurance Co. v. Landram, supra, was followed and approved, with this explanation or modification:   "It was not intended to there decide the judge of the court has the right to put in issue or call in question

the truth of the statement of facts contained in the affi-
davit, but simply that there must be in the affidavit such
fact or ground for belief stated as would prevent an offi-
cial of personal integrity from presiding in the case, or
as would prevent him affording a fair and impartial trial,
and, when such affidavit is filed, the statements of fact it
contains, and of the belief founded thereon, must be taken
as true. Nor was it intended by the opinion to decide that
a party may not file an affidavit based upon facts discov-
ered after the issues were formed." Massie v. Com., 93
Ky., 588, 14 R., 564, 20 S. W., 704, was decid-
ed September term, 1892—a case which, as we re-
member, came to this court on appeal a number
of times. The sole question involved in that ap-
peal was the sufficiency of the affidavit filed by the
accused against the trial judges sitting in the case. In re-
versing the judgment for the second time, the court stated
the contents of the affidavit and its conclusion thus: "Ap-
pellant's affidavit discloses the fact that the judge, after the
first trial of his case, criticised to divers persons those of
the jury that favored the appellant; that he denounced the
appellant's case as the most bloodthirsty that was ever
committed; that the judge knows that there is a rabid and
unhealthy feeling against him in Owen county; and that
the judge, in the presence of crowds, expresses, during
canvasses for the various offices, the circuit judgeship being
one, his opinion as to affiant's guilt—and the judge so rules
as to satisfy the bloodthirsty crowds; that he is personal-
ly hostile to the affiant." And although there was no error
in the record in any other part of the trial, so far as could
be discovered by the court, this court, in a most vigorous
and characteristic opinion by Judge Bennett, held that,
where such facts are made to appear by proper affidavits,
the judge should then vacate, and it is reversible error if

he does not.  In the case of Schmidt v. Mitchell, 101 Ky.,
570, 19 R., 763, 41 S. W., 929, 72 Am. St. Rep.,
427, the court quoted approving from Insurance Co.
v. Landram, supra, which case was also approved
in the Massie case, above cited. In the case of
Schmidt v. Mitchell the only expression of the
court as to the sufficiency of the affidavit there, or as to
the averments of the affidavit, was as follows: "A care-
ful examination of the affidavit filed in this case shows
that the averments are based almost entirely upon hear-
say, and that it is not drawn in conformity with the rule
laid down in the Landram case supra.  We do not feel au-
thorized to hold that in deciding this affidavit to be insuffi-
cient, there was an abuse of judicial discretion by the trial
court."  Counsel for appellee have obligingly copied into
their brief, as an appendix, what they say is, and what we
assume to be, a copy of the affidavit referred to by the
court in the language just quoted.  The other facts appear-
ing in the Schmidt case are not shown in the opinion or
in the affidavit further than was necessary to decide the
other questions disposed of by the court.  It would ap-
pear that this affidavit was filed long after the court had
ruled upon many of the questions presented by various
motions and pleadings, and had thus indicated pretty con-
clusively the views of the law applicable to the case.  It
should be borne in mind, too, that Schmidt v. Mitchell was
in equity, where every ruling of the chancellor, and his
every finding of fact, were subject to review and reversal
on appeal, and where, consequently, his bias, if it existed,
was comparatively harmless—not affording the opportuni-
ties for irremedial wrong so forcibly expressed in the Mas-
sie case.

It is insisted for appellee that the case of Schmidt v.
Mitchell virtually overrules Massie v. Com., that Massie

v. Com. had virtually overruled Insurance Co. v. Landram, and that Insurance Co. v. Landram was a material departure from, if not in conflict with, Turner v. Com. As a matter of fact, Insurance Co. v. Landram quotes approvingly and relies upon Turner v. Com. It does seem to be an extension, or at least an elaboration of the principles announced in Turner v. Com. Massie v. Com. explicitly cites and relies upon and approves Insurance Co. v. Landram. It can not be said to overrule that opinion. Vance v. Field seems to modify, or at least to explain, Insurance Co. v Landram. Such an important line of cases apparently so thoroughly and carefully considered will not be held to be overruled by an opinion containing such general terms as are in Schmidt v. Mitchell. The better course, and we believe the true one, is to read all these opinions and the statutes together, in the effort to arrive at what has heretofore been held to be, and what in accordance with such holdings is now, the law of this State upon this subject.

In addition to the opinion above mentioned the case of Givens v. Crawshaw, decided March 17, 1900, reported in 21 R.,1618, 55 S. W.,905, is applicable and clearly in point. In that case the affidavit against the judge, the Honorable M. J. Moss, of the Bell circuit, was that the said judge would not afford the affiant a fair and impartial trial, because of their political differences, and because the affiant had voted against the judge and for his opponent, and took an active part in the election, and since the election the judge had threatened that all who had bolted from his party in that election would have a hard road to travel, etc. The case of Insurance Co. v. Landram was again referred to and relied upon in the opinion, and while it was in this opinion conceded that the statute simply required the affiant to state that he does not believe the judge will afford

him a fair and impartial trial, yet the additional facts required by the Landram case, supra, to be stated, were held to be necessary. Said the court: "We do not think that it is necessary in all cases, or at all, in fact, that the affiant should state facts which tend to show that the judge was intentionally unfair, or that he would knowingly disregard the law or the evidence, to the prejudice of the affiant. It may, however, sometimes happen that conditions or circumstances are such that the perfectly honest and competent judge would in fact be unable to afford a litigant such an absolutely impartial trial as the law intends and requires. In the case under consideration the facts stated in the affidavit do not import intentional unfairness or wrong, but, if true, they might create an impression upon the affiant that the judge, however honest and pure his intentions may be, had become so prejudiced that, imperceptibly to himself, he would be unable to give a fair and impartial trial." The court held the refusal of the judge to vacate the bench was error, and the judgment was consequently reverse

With the wisdom of the enactment of such a statute we have nothing to do. That is a question solely within the province of the law-making body of government. Nor can the fact that some litigants abuse this privilege of the statute, and do so to the great injustice of the trial judges and the adverse party, influence a fair interpretation of the law as it is. Many statutes are abused, but we never feel justified in declaring that they are inoperative because of that fact. The Legislature doubtless saw, and, in the experience of many years that this law had been upon the statute books of this Commonwealth, may have been confirmed in the belief, that it was necessary to the just protection of the rights of litigants, and to an absolutely fair

and impartial administration of justice through the courts, that such statute should be in existence; that such a right should be available to the litigant, where the facts justified its employment. From this statute, and the decisions quoted from, the law may be gathered to be, if a litigant files his affidavit, stating that the judge will not give him a fair and impartial trial, and states therein the basis of such belief, and if the facts so stated are such "as would prevent an official of personal integrity from presiding in the case or as would prevent him from affording a fair and impartial trial," then the truth of the statement of the facts as set out in the affidavit must be assumed for it cannot be traversed or tried.

Applying the law thus epitomized to the affidavt in question in this case, we find that appellant in that affidavit charged, in substance and effect, as follows, so far as the facts charged were material or relevant: That the trial judge was of the same political faith as the decedent, William Goebel, was his intimate personal friend, and in close sympathy with him in his contest for governor, and that by reason of those circumstances, and the intense political excitement existing at the time of the assassination of Senator Goebel, the judge had conceived and entertained a feeling of hostility and prejudice against the accused that wouid prevent his affording a fair and impartial trial of the case. Numerous circumstances are recited, alleged to have occurred on the former trial of the case, indicating the existence of the feeling alleged. Among other matters specifically charged is the one of the manner of selecting the jury so as, it is stated, none but intense partisans, in sympathy with the prosecution, were selected, "said judge well knowing their bias and prejudice against defendant

[i. e., the jury commissioners], and believing they would
be governed by their political prejudice and hostility to
defendant in the selection of names for said wheel." In
other words, the affidavit charges that the trial judge, on
account of an intimate friendship for the murdered man,
a partiality for his cause and course, and on account of
his hostility and prejudice against the accused, would not
afford or allow him a fair and impartial trial, and in pur-
suance of such hostility had actually taken such steps as
would result in his being tried by a jury prejudiced against
him, and selected for that purpose. The facts upon which
the alleged hostility was based, and its causes, are set out
with much particularity. If the facts alleged in the affi-
davit are true, they clearly bring the case up to the re-
quirements heretofore laid down by this court in making
out a sufficient case under this statute. We do not mean to
be understood as saying that a judge of one political faith
may not properly try the case of a litigant of a different
political faith, though the question involved was one pure-
ly political. Nor is the mere fact of a difference in polit-
ical belief or affiliation a legal ground for objecting to a
trial judge. We do not believe (such has not been our ob-
servation or experience, nor has such been the history of
the judiciary of this State) that the judges' political views
control their decisions upon matters of law before them for
adjudication. It will be a most calamitous day for the
Commonwealth when such comes to be the case. But cases
may arise (it is easy to conceive of them) where a judge
may become disqualified in fact and in law, by an undue
bias, from properly presiding in a case that has grown out
of a political controversy, as well as any other controversy.
It was so held by this court, and explicitly applied, under
allegations no stronger, if as strong, nor more definite,

than here, in the case of Givens v. Crawshaw, supra. If the fact be that the judge is biased or prejudiced against a litigant because of politics, it would seem to disqualify him as certainly and completely as if he were prejudiced or biased against him for any other reason. The objection is a state of bias which destroys impartiality, whatever may be its cause. Nor does such a state of case necessarily imply corruption on the part of the judge, or that he would knowingly disregard the law or the evidence. As said in Givens v. Crawshaw: "It may, however, sometimes happen that conditions or circumstances are such that the perfectly honest and competent judge would in fact be unable to afford a litigant such an absolutely impartial trial as the law intends and requires."

We have so far discussed this question, as all the authorities quoted and cited require, upon the hypothesis that the facts stated in the affidavit were true. We are far from intending to be understood as giving our assent to their truthfulness. It would be both improper and unjust to do so. Beside the legal presumption of official integrity attaching, the long and distinguished official career of the learned trial judge who presided in this case would arrest the judgment and comment of all at the point where the law limits them as necessary functions in trying the exact question involved. By express declaration of law the judge can not controvert the statements of the affidavit. In argument, counsel for appellee assert that the affidavit is untrue. In the Turner case and in Vance v. Field and in Givens v. Crawshaw, cited, the trial judge in each instance controverted of record the truthfulness of the affidavits. But in each instance, also, their sufficiency was tested by their own averments, and without regard to the judge's traverse. As a rule, prejudice is honest,

and bias may be innocent. In the very nature of the case, therefore, it is extremely difficult, if not impossible, for the mind so affected to realize, much less to judicially try, its own impartiality. It may also be true that the trial judge, selected by his constituents presumably upon their faith in his probity, whose official integrity, as it were, is thus assailed by a litigant whom he may not know, and for whom he may have no personal regard one way or the other, may be compelled to try the sufficiency of such allegations in an affidavit which, in his conscience, he may know to be unfounded and utterly false. The arguments here naturally first coming to mind, and, indeed, those principally employed by appellee in this case, go to the question of the wisdom or propriety of the statute. If the court felt at liberty to reconsider the rule laid down in all the other cases cited (which we do not), we might feel persuaded that it were best to rest such questions upon the express words of the statute, leaving all questions of propriety, probable abuse, and overbalancing benefit to the consideration of the Legislature, where they belong. We conclude that the trial court erred in not vacating the bench upon the motion and affidavit discussed.

### Rulings on Admitting and Refusing Evidence.

As the learned trial judge pursued in the main a consistent course of ruling on the relevancy and competency of evidence offered, it is deemed unnecessary to take up each objection separately, and to pass upon it specifically. Instead, examples of a class will be selected, where practicable, and the rulings upon the retrial will be made to conform to the line suggested in this opinion.

As has been stated, it was the effort of the prosecution to prove that the large party of men who came to Frank-

fort January 25, 1900, had as their purpose the intimidation of the Legislature by force and violence, which would, of course, have been unlawful, and that it was in execution of this purpose that Senator Goebel was shot by some member of that party, or by some-person acting with them. It was therefore proper to show the real purpose of this assemblage of people. In order to do this, what they did and said at the time was relevant. Evidence of that charactr was properly admitted by the trial court. This crowd was gathered mainly from the southeastern part of the State from what are termed "mountain counties," the votes of some of which were particularly the subject of the pending contests. It is therefor that this crowd of people were generally spoken of as "mountain men" or "mountaineers." It was in evidence, also, that numerous men from substantially the same section had been at Frankfort, and continued to be, throughout the contest. These latter, in some instances, were not shown to have been a part of the large crowd of the 25th of January.

The testimony of Eph Lillard as to an occurrence at dinner at the Board of Trade Hotel on January 25th when one of these parties "sweetened his coffee with a forty-four," is relevant, if the person testified about was identified as one of those who came in the crowd mentioned. We understand this witness to have so identified this man, in which event the testimony was properly admitted. In other words, we hold that statements made by members of this party of January 25, 1900, gotten together by Powers, or by others under him, or by those jointly operating with him, made at a time when they were acting in the consummation of the purpose of their coming to Frankfort, or made in the furtherance of such purpose, and of acts done by them, when they are identified, not necessar-

ily by name or place of residence, but as a matter of fact,
as having been members of such party, are relevant. This
observation, of course, applies to other parties that were
procured under similar circumstances; it being asserted
by the prosecution that there were one or two other such.

On the other hand, we hold, as was held on the former
appeal, that statements made by unknown and unidenti-
fied persons at Frankfort or elsewhere, or even by persons
known and identified, but not charged jointly with the
accused in the perpetration of this crime, where such per-
sons are not known to have been acting with the accused,
or some of those jointly indicted with him, in the plot to
assassinate Senator Goebel, or to do violence to mem-
bers of the General Assembly in general, are not compe-
tent against appellant. The statements and acts of this
last class of persons must be held to be their own acts
alone. The whole doctrine of allowing the acts and declar-
ations of a conspirator as evidence against a co-conspirator
is based upon the theory of agency. It is elementary that
the agent may not, by a mere declaration or averment out
of court, prove his agency, so as to bind the reputed prin-
cipal. Nor can recitations made by such agent after the
termination of the agency, or while not engaged therein,
being in their nature historical or reminiscent (that is,
declarative of a past fact), be relevant as against the puta-
tive principal. His declarations, however, made in the
prosecution of the enterprise in hand, given in his charge
by his principal, are regarded somewhat in the nature of
the *res gestae*—as being verbal parts of what he is doing.
So what the agent says in furtherance of his principal's
cause, which is a part of it, and to help it along to a con-
summation, is relevant. All the authorities agree (those
cited by appellee and those by appellant) that the declar-

ations of an accomplice, to be admissible as evidence against his co-conspirator, must be such either as to form a part of the *res gestae*, or be in furtherance of the criminal project. Wright, Cr. Consp., 218, etc.; Spies' Case, 122 Ill., 1, 12 N. E., 865, 17 N. E., 898, 3 Am. St. Rep., 320. And see authorities on this point in former opinion. The word "furtherance" had a well-defined and generally accepted meaning, which is "the act of furthering or helping forward, or promotion or advancement."

It is attempted to justify in argument the admission of disconnected statements of persons who are not shown to have had any connection at all with appellant, or any of those jointly indicted with him, by merely showing that they visited the statehouse square during the contest proceedings, and had access to, and opportunities for conversation with, then Gov. Taylor, appellant, and others who are jointly indicted with them. It may be assumed as a fact that a great many people in this State, of undoubted personal integrity, sympathized politically with Gov. Taylor and his associates upon that ticket in their race for their respective offices, and that they likewise sincerely believed that Taylor and his associates had been really and fairly elected; that consequently they earnestly hoped that they might retain their respective places, and to that end they gave these officials the benefit of their encouragement or presence or advice. The same thing may be said, and be equally true, of the adherents of the other side, with respect to their candidates and their causes. Nothing criminal, nor even reprehensive, in the eye of the law, can be imputed to such conduct. These facts alone, however, do not in any sense constitute, or tend to show that there was, an unlawful conspiracy by these parties to commit crime. For these reasons, we think the testimony of witnesses

Judge Hazelrigg, Ray, Barlow, Rosseau, Stivers, Miles (in rebuttal), and Armstrong irrelevant, as against appellant. To have knowledge of a crime, it is not necessarily implied that one possessing such knowledge is a party to it. The utmost that is apparent concerning the testimony to J. W. Ray and Judge Hazelrigg as to communications made to them by Guffy, and similar testimony of other witnesses on like points of evidence, is that Guffy and such other witnesses had information of such facts as induced them to believe that Senator Goebel would be killed. Such information would not necessarily make its possessors parties to the plot to do the killing nor does it, alone, tend to prove that they were parties to such a plot.

A number of telegrams were introduced, some of which were signed by Collier, some by Reynolds, Sharp, Denny, and various others, all written and sent directly after the assassination of Senator Goebel. In so far as such telegrams were sent by appellant, or any of those jointly indicted with him, or who were shown to have been acting under and by authority of appellant and such persons jointly charged with him, we are of opinion that they were relevant; otherwise not.

As to telegrams sent by Collier and others in the military service, and sent immediately after the assassination, as well as other acts done by the military immediately after the killing, and so nearly connected therewith as to be a continuation of what was then transpiring, we think they are properly admissible. At the time of the killing, Wm. S. Taylor was the acting governor of the Commonwealth. As has been stated, he has been indicted jointly with appellant, as an accomplice. Under the rules of evidence, what he did, if anything, at the time, and prior to the killing, that was in furtherance of the alleged plan to

kill Senator Goebel, is relevant on this trial of appellant, under the principles already discussed. Consequently his orders and directions to the State militia, in so far as they had, or reasonably appeared to have had, connection with the event of the killing, under the theory of the prosecution, was properly admissible. And it is under this head that the Collier telegrams were admissible. In this connection it was shown that, directly after the assassination, Gen. Collier sent telegrams to Col. Williams, of the 2d regiment, and Col. Mengel and Lieut. Col. Gray of the 1st regiment, worded, "All right." In response to these messages, these commanding officers brought their regiments forthwith to Frankfort. The defense offered to prove by Gen. Collier, who was adjutant general, and in command of the militia of the State, whether in the sending of such messages he used a military code or signal previously agreed upon between him and his subordinate officers, and, if he did, to explain what the words used were agreed to represent, or what meaning it was agreed that they should convey. This was objected to by the prosecution, and the objection was sustained upon the idea that the words used had a plain meaning, and that the written telegram could not be varied or explained by parol testimony. Ordinarily the rule is that unambiguous writings offered in evidence can not be explained or changed by parol testimony. But it is the very essence of all code or cipher arrangements for transmitting intelligence that the words actually employed should have a different meaning from that accorded to them by general use. It is not unusual (indeed, it is understood to be the custom) to employ code or cipher forms for transmission of messages in military operations. We know of no rule that requires such code or cipher agreement to be in writing. If it is understood by the parties

to be affected, its purpose is served. Therefore it was competent to allow those acquainted with the code or signal or cipher agreed upon to explain what the words actually used had been agreed upon as representing. It also should have been allowed to be shown when such signals or cipher had been adopted by the adjutant general's office, for what employed, what it signified, and when and on what occasions to be used. We are of the opinion that the words "All right," as employed in these telegrams, were ambiguous; that is, of doubtful meaning, or susceptible to two or more constructions.

Certain letters written by appellant were offered in evidence against him. He offered to explain in his testimony what he meant by certain expressions contained in the letters. This was overruled. We think, properly so. The meaning of a writing, where its terms are not ambiguous, must be gathered from the writing itself.

These letters fall within that rule. The court allowed the witness Prof. Stephens, in testifying for the Commonwealth, to explain why he wrote certain letters to appellant. The reasons for writing his letter do not appear to have been all disclosed to appellant at the time. Such reasons are not material, for they appear to have been, at best, but suppositions of the witness, based upon general rumors.

This witness (Prof. Stephens) was asked if the reason why he had left his former home, Barbourville, was not because appellant "and his adherents in that locality" had so treated him and behaved towards him as to make his removal necessary. The witness exculpated appellant from participation, but answered the remainder of the question in the affirmative. This alleged treatment is said to have occurred after appellant's first trial. It clearly can not be charged to appellant that other people, of whom he had no

control, a year or more after the commission of the crime for which he is being tried, had mistreated a witness for the prosecution.

George W. Long and other witnesses were asked as to what appellant said directly after the information was conveyed to him of the killing of Senator Goebel. It was shown that this was some minutes after the news had been communicated to appellant. The court rejected this evidence, and we think properly so. It could not have been a part of the res gestae, and there is no rule of evidence with which we are acquainted under which it could have been admitted.

The evidence of C. M. Barnett for the defense, appears to us to be immaterial.

The opinion on the former appeal sets out that the real purpose of the crowds who came to Frankfort during the time of the contests, so far as such crowds were brought or induced to come by appellant and those jointly charged with him, was relevant, and might be shown. This includes, as has been stated, what such crowds or their members did and said in furtherance of the object of their coming. And the use of the militia immediately following the assassination of Senator Goebel being proved, it was permissible to prove also that they were called out for a proper and lawful purpose, if such was the fact. Therefore, when the defense offered to prove that it was a fact that there were angry and excited crowds gathering about the executive grounds, threatening the occupants of the executive buildings with violence, and that statements of members of these crowds were incendiary in their nature, and that, from the appearance, demeanor, or threats of such crowds of their members, riot appeared imminent, these facts were clearly relevant. It was also offered by the de-

Powers v. Commonwealth.   (2d Trial.)

fense to prove, but the court rejected it, that there was a common rumor current in Frankfort at that time that a large body of armed men frequently assembled in the buildings near the statehouse for the purpose of ejecting, and intending to forcibly eject, the Republican officers from their offices. It was the purpose, evidently, of the defense, to show the existence of these general rumors as a justification for their being in readiness with the militia to protect themselves in their offices. We are of the opinion that whatever knowledge or direct information was possessed by the executive authorities concerning these matters was competent. The trial court seems to have so ruled. But mere rumors should not be admitted.

A witness for the prosecution (Wharton Golden) is alleged to have made a statement to R. L. McClure affecting the credibility of the said Golden as a witness. This is the conversation that is alleged to have occurred near the Phoenix Hotel in Lexington. The defense offered to prove this statement of Golden's by witness McClure, and was refused. We are of opinion that this evidence should have been admitted. We think the admissibility of other evidence objected to may be tested and regulated by the foregoing.

The testimony offered by S. H. Stone to prove that a witness for the Commonwealth (Culton) had defaulted or been guilty of embezzlement was properly rejected. The method of thus impeaching a witness is to prove his conviction under such charge. See Howard v. Com., 110 Ky., 356, 22 R., 1807, 61 S. W., 756, and cases there cited.

Objection was made to the competency of the witnesses Golden and Culton, indicted as accomplices in the crime for which appellant was being tried, because the charge against the said witnesses was not first dismissed, and because to permit them to testify for the Commonwealth, under the

circumstances, was, in effect, to make their own immunity dependent upon the effectiveness of their service to the prosecution. The majority of the court is of opinion that these witnesses were competent. The question of their credibility and the weight to be accorded to their evidence is to be determined by the jury in the light of all the facts and circumstances.

Rev. Cody testified as a witness for the defense concerning certain alleged statements of the Commonwealth's witness Golden, which affected the credibility of the latter. On cross-examinaton, Rev. Cody was asked if he had not on the ocasion in question, loaned some money to Mr. Stamper, to whom he says he was then making a pastoral call. Stamper was a brother-in-law of Golden. The witness was required to answer, and said that he had. We are of opinion that this evidence was immaterial, and improperly admitted. Upon precisely the same grounds the evidence offered that Ed. Steffy had tried to borrow money from supposed friends of appellant was irrelevant, and was properly rejected.

Walter Day wrote to C. B. Hill that he possessed certain information of value to the prosecution, as against Youtsey, and suggested that the Commonwealth's Attorney be apprised of the fact, so that he would be summoned. He later wrote, asking Hill to destroy the first letter. Day's testimony was prejudicial to Youtsey, and was used on this trial; Youtsey being jointly indicted. The letters, however, appear to be wholly immaterial, and therefore irrelevant as evidence against the accused.

### Did the Action Stand for Trial at the First Term at Which the Mandate of Reversal was Noted of Record?

After the reversal of the former judgment in this case, and more than ten days before the next succeeding term

of the Scott Circuit Court, the attorney for the Common-
wealth filed in the office of the clerk of the Scott Circuit
Court the mandate of this court reversing the former judg-
ment, and also caused to be served upon appellant and upon
his counsel notice to the effect that such mandate had been
filed, and that the Commonwealth would urge a trial of the
case at the succeeding term.   When the court convened the
filing of the mandate was noted of record.   Appellant ob-
jected to the trial at that term because it is insisted for
him that the case did not then stand for trial, but that it
would be for trial at the succeeding term; that the Scott
Circuit Court did not regain jurisdiction over the case
until after the filing of the mandate had been noted of
record in open court.   There is no provision in the Criminal
Code of Practice for filing a mandate of the reversal in the
clerk's office and given notice to the adverse party more
where the accused, who had been sentenced to a term in
the penitentiary, had not caused the judgment to be sus-
pended, but had been carried to the penitentiary in the exe-
cution of the judgment.   In that state of case is provision
made for filing of the mandate out of term time, and for
proceedings thereon.   Nor is there anything in the Crim-
inal Code of Practice which would prevent the circuit court
from proceeding with the trial of the accused at the same
term at which the mandate of the Court of Appeals revers-
ing the former judgment had been filed.   The question, of
course, would be presented, whether the acccused had had
reasonable opportunity since the reversal to prepare his
case and procure the attendance of his witnesses.   The
Commonwealth's Attorney in this case followed the pro-
visions of the Civil Code of Practice on this subject, where-
in a provision is made for the filing of the mandate in the
clerk's office and giving notice to the adverse party more

than ten days before the beginning of the term, in which event the case would stand for trial at that succeeding term. The court is of the opinion that the case stood for trial at the term of the court during which the filing of the mandate was noted of record, subject to whether the parties had been afforded reasonable time and opportunity to prepare for trial.  The service of the notice in this case was acted upon by appellant and his counsel with expedition, and they had furnished to them all the process that the court could have awarded them, and, in our opinion, had reasonable opportunity and time to have prepared for trial. At least, the contrary is not shown.

An affidavit for a continuance was filed by appellant because of the absence of numerous important witnesses. Many of these witnesses actually appeared at the trial, and the affidavit was allowed to be read as the depositions of those absent.  After the accused had been afforded the process of the court, and had employed it without avail, his witnesses being absent at the trial, the court could only reasonably do two things:  One was to allow the affidavit to be read as the depositions of the absent witnesses, and the other was to award an attachment for those who had disobeyed the subpœna. Both of these the court did in this case. We are unable to see that appellant was not afforded a reasonable and fair opportunity to present his case in this respect.

It is then contended for appellant that the affidavit should have been read as true.  The Criminal Code provides that this shall be done only when the trial occurs and is forced at the indictment term; that is, the term of the court at which the indictment is returned.  There is no provision for its being done otherwise, except that the trial court may, when, from the nature of the case, the

ends of justice require it, grant a continuance unless the attorney for the Commonwealth will admit the truth of the facts which it is alleged in the affidavit such absent witnesses would testify to. Act 1886, amending section 189, Criminal Code Practice. In construing this act, this court, in Adkins v. Commonwealth, 98 Ky., 539; 17 R., 1091; 33 S. W., 948; 32 L. R. A., 108, held it to be not violative of that section of the Constitution found in Bill of Rights, par. 11, to-wit: "In all criminal prosecutions the accused has the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor,"—to force a trial of one accused of crime, although some of his witnesses were absent, if the affidavit for continuance was permitted to be read as the evidence of the absent witnesses, subject to competency, relevancy, etc., provided the accused had previously been furnished the compulsory process of the court, and allowed a reasonable opportunity to procure the attendance of his witnesses. The "compulsory process" means not only the ordinary subpœna, but a warrant of arrest or attachment for such witnesses as failed to obey or avoided service of the first subpœna or recognizance.

## Night Sessions.

A motion was entered by appellant to discontinue the night sessions, which was overruled. The regulation of its hours of session must, from the nature of the case, be left largely within the discretion of the trial court. It alone knows the condition of its docket, and the demands made by the matters before the court upon the time allotted by statutes to the term. Unless such discretion has been man-

ifestly abused, to the prejudice of appellant, this court will not interfere. We can not say in this case that there has been such abuse. We are not advised as to the condition of the docket of the Scott Circuit Court at that time. The court subjected both sides, and its judge, to the same treatment, apparently, as to working hours.

### The Pardon Issued by W. S. Taylor.

It is again argued that the pardon issued by Wm. S. Taylor, professing to be acting as governor of the Commonwealth, on the 10th day of March, 1900, remitting the penalty, and pardoning appellant of this crime, is good, at least as the act of a *de facto* officer: that Taylor was then actually in possession of the office and archives, and was exercising the prerogatives of the office of governor, and as such *de facto* officer his acts, as between all others, are valid. This question was also fully and carefully considered by the court on the former appeal; and the ruling then made, for the reasons then assigned, is adhered to.

### The Motion for Peremptory Instruction.

At the close of the evidence for the Commonwealth, and again at the conclusion of the trial, appellant moved for a peremptory instruction to the jury to find him not guilty, based upon the idea that there was no competent evidence, other than that of those charged as co-conspirators, connecting him with the commission of the crime for which he was being tried. The rule early adopted and persistently adhered to by this court in criminal cases, where there is any evidence tending to establish the guilt of the accused, is that the question is one for the jury. Of course, it follows that if there is no evidence, or no competent evidence, which is the same thing in law, against the accused,

he would be entitled to a discharge. And under the Code, if the evidence of those charged as co-conspirators was not corroborated, he would likewise be entitled to a discharge. In the argument of appellant's counsel under this head, the correctness of the foregoing is admitted. To show that there is no evidence against the accused, resort must be had to, and in the able and earnest argument made in behalf of appellant the effort is made to meet this rule by an analysis of the evidence for the Commonwealth, in which probability, verity and veracity are discussed. This very argument concedes that there is evidence, if credited, that would operate to take the case to the jury. The weight to be given to evidence and the credibility of the witnesses is always a matter for the jury. If full credit is given to the testimony of the Commonwealth's witnesses, such a case is made out as, under the rule stated, we could not, without an invasion of the well-established province of the jury, order the case taken from them. Nor should this court be tempted to do so even by the argument that the violent passion of the jury may result in a particular instance in the miscarriage of justice. However, as in times of high excitement, juries may err upon one side or the other, it is believed that the greatest safety to our institutions, and the best guaranty of the citizens' liberty, lie in the careful and faithful preservation to its fullest extent of this ancient right of the English-speaking people. The motion was properly overruled.

### The Jury.

Objections were made by affidavit and motion to the manner of selecting the jury in this case, and to the venire because of its bias. The charges made are of a most serious import, if true. But it is proper to state that they

Powers v. Commonwealth.   (2d Trial.)

are controverted, except as to the fact of the political affil-
iation of the panel summoned in the case. It should not
be said, and it can not be true, that per se a Democrat
is disqualified from fairly trying a Republican charged with
crime, or *vice versa*. If men should be selected as jury-
men whose prejudices would be relied on to procure a con-
viction or acquittal of one whom they are trying, charged
with crime, we are fully persuaded that the fact of the
politics of such jurymen would not be the cause of such
selection. It would be the character of those so selected.
But it has been held (Terrell v. Com., 13 Bush, 246; Ken-
nedy v. Com., 14 Bush, 342; Forman v. Com., 86 Ky., 606,
9 R., 759, 6 S. W., 579) that objection to the panel of the jury
shall not be subject to review by this court. It is the opinion
of the court (a point upon which, however, we have not
been in entire accord) that under paragraph 281, Cr. Code
Prac., this court has no jurisdiction to pass upon these
questions. In the opinion of some of the members, when
jurisdiction is conferred upon this court of this class of cases
it is not competent for the Legislature to limit the court
as to what errors it may reverse for, or as to what shall
not be subject of reversal; that to so allow is to leave the
propriety and legality of the proceedings in the court to
legislative, and not judicial, control. The majority of the
court adheres to the former rulings on this subject. The
manner of selecting the jury, except as regulated by stat-
ute, is within the control of the trial court. To its sense
of fairness and desire to dispense that justice in trials whose
essence is impartiality, this question must be left.

### Instructions.

The court can but reiterate what was written in the form-
er opinion in this case as to proper instructions to have

been given to the jury. In that opinion some criticism was
made of the failure of the court to clearly define the phrase,
"for the purpose of doing an unlawful or criminal act."
In the fourth instruction given on this trial the court
seems to have defined such purpose to have been that of
killing a member or members of the Legislature of which
William Goebel was a member, but in the seventh instruc-
tion given to the jury the court adds no such qualifica-
tion or explanation to the phrase; the jury being told that
if appellant and those jointly charged with him, or any of
them, "conspired to do some unlawful act, and in pursuance
thereof," etc. Nowhere in this instruction is it stated what
the unlawful act was, but the determination of that mat-
ter, both as to the fact and the law of it, seems to have
been left to the jury. The court is of the opinion that the
trial court should have instructed the jury in this instruc-
tion, as in the fourth, what would have been such an un-
lawful act, within the contemplation of law, and as was
embraced by the evidence allowed to go to the jury.

For the reasons indicated, the judgment is reversed, and
cause remanded for a new trial under proceedings not in-
consistent herewith.

Dissenting opinion by Judge Hobson, in which Judges
Paynter and White concur:

The pivotal question in this case is whether the circuit
judge should have vacated the bench on the affidavit filed
by the defendant. In refusing to do so, he followed the
decision of this court in the case of Schmidt v. Mitchell,
101 Ky., 570, 19 R., 763, 41 S. W., 929, 72 Am. St. Rep., 427.
In that case the affidavit was substantially the same as that
filed in this case. It was held insufficient, and the refusal of

Powers v. Commonwealth.　(2d Trial.)

the circuit judge to vacate the bench was sustained. That opinion was written by Judge Du Relle, and was concurred in by the entire court. It followed the cases of Insurance Co. v. Landram, 88 Ky., 434, 10 R., 1039, 11 S. W., 367, 592, and Vance v. Field, 89 Ky., 178, 11 R., 388, 12 S. W., 190, and has since been regarded as settling the question in the State. The case of Massie v. Com., 93 Ky., 588, 14 R., 564, 20 S. W., 704, was distinguished by the court from these cases, and not intended to lay down a different rule. We see no reason for disturbing a rule so well settled, for justice can not be administered properly if the rule on this question is uncertain. There are sound reasons for the rule thus declared. Otherwise the regular judiciary of the State may be displaced on the second trial of any case when the ruling of the judge on the first trial does not suit the litigant. Substantially the same ground of objection might have been made by appellant to a large number of the circuit judges of the State, and the rule now adopted by the court is, in substance, an overruling of the cases above referred to.

In order to a proper understanding of the exceptions to the rulings of the court in the admission and exclusion of evidence, and their bearing on the case, it will be necessary to state in a general way the facts established by the proof. For convenience, these will be grouped under the following heads:

(1) Where was the shot which killed the deceased fired from? The east building in the Capitol Square is known as the "Executive Building." On the first floor of this building, on the south side, at the west end, is a small room, known as the "Private Office of the Secretary of State." This room has a door opening into the hallway, and one opening into the room on the east, called the "Reception Room." East of this room is the governor's office, and

north of it the treasurer's office. Across the hall, and on the north side of the building, is the auditor's office. The upper floors of the building are occupied by the other State officials. The deceased was shot a little after 11 o'clock in the morning, as he came up the walk, approaching the State buildings from the street lying south of them. Shortly before he was shot, Henry E. Youtsey, now in the penitentiary under a life sentence for complicity in the murder, went over to the office of the commissioner of agriculture, which is west of the main building, and brought a squad of men, armed with guns, stationing them near the foot of the stairway in the hall, not far from the door leading from the hall into the private office of the secretary of State, and telling them that, after a little, a man would come out of that room and join them, and they should all go off together and scatter. Just after the shooting, Youtsey was seen running down the stairway leading from near this door to the basement, apparently carrying something under his coat. Witnesses skilled in the use of fire arms testify that the report of the shot which killed the deceased showed that it came from a rifle loaded with nitro powder, which is smokeless. The deceased was facing the building, or nearly so; and, as was shown by the post mortem examination, the ball struck him in front, and came out behind, slightly lower than the point of entrance. Not only was the clothing mashed inward in front, and outward behind, but particles of bone were carried along by the ball, showing its course. The effect of the ball on the bones showed that it was a steel bullet of 38 caliber. A few days before the shooting, Henry E. Youtsey had in his possession a box of nitro-powder cartridges, with steel bullets, which he said was the slickest scheme yet to settle the contest. These bullets were 38 caliber. The point where the de-

ceased was when shot is identified not only by the persons with him at the time, but is fixed further in this way: Four different persons saw him fall, or after he fell, from different standpoints,- and were enabled to fix their line of vision from a tree or some other object in the yard which was between them and him. These lines intersect practically at the point identified by the persons present at the time. In a hackberry tree beyond this point, and in a direct line with it and the window of the private office of the secretary of State, a ball was imbedded,—a steel ball of 38 caliber. From the point where the ball struck the tree, a straight line to the bottom of the window would pass over the place where the deceased was shot at just the height from the ground at which the ball entered his body. It was a cold, raw day. A witness who passed up the walk shortly before the shooting noticed this window up, and the blind drawn down; his attention being attracted to it from the character of the day. Another witness, who accompanied the deceased, observed the same; and a third, who looked at the window just after the shooting, testified to seeing a gun barrel sticking out of it. When the deceased was shot, he raised himself on his elbow and looked in the direction of the window, and a number of witnesses testify to the sound coming from that direction. When a surveyor was making some measurements, several days after the shooting, with a view to locating where the shot came from, a witness, Wharton Golden, who has since confessed as an accomplice, asked appellant, "What are they doing?" He answered, "He is trying to find out where the bullet came from," and added, "There is no doubt that the bullet came from this office." Against this great mass of evidence the defendant introduced some proof to show that deceased was south of the point fixed by the Common-

wealth when shot, and also to show that the shot came from the space between the Executive building and the center building.   But the witnesses who located the place where the deceased fell as further south were some distance from him and to the south of him, and had nothing by which they could determine accurately how far he was from them, and they might naturally make a mistake in thinking that he was nearer to them than he was, as he was walking away from them; while the testimony for the Commonwealth is by persons who were with the deceased, or picked him up after he was shot, and those to the right and left, who observed certain obstructions between him and them, and thus identified the point beyond question.   The proof, too, about the shot coming from between the buildings, is equally uncertain, and is met by the positive testimony of a reputable witness who was standing there at the time in this space, and testifies that the shot was not fired from there, but the sound came from around the corner, in the direction of the window referred to.   In view of the facts, it is submitted that he who will not believe, under the testimony, that the shot which killed the deceased came from the window of appellant's private office, would not be persuaded, though one rose from the dead.

(2) Was the deceased killed pursuant to a conspiracy? The shooting occurred in broad daylight, just in front of the capitol of the State, when the Legislature was assembling.   The shot was fired from the private office of the secretary of State, in the Executive building, in which were the offices of the executive officers of the State.   Can it be believed that an assassin, single-handed and without accomplices, could have done such a thing and vanished without immediate detection?   Beside the fact of Youtsey's

bringing the crowd of men over, above referred to, it is shown in the evidence that on previous days there were always a number of persons, belonging to the crowd that appellant had brought to Frankfort, in front of the capitol buildings about this time. On this morning there was none. Just after the shooting, men with guns in their hands were stationed at the entrance to the Executive building, to prevent persons from coming in. That morning at the arsenal a company of militia, which had been there for some days, were for the first time issued ammunition and overcoats, and kept in line; and these, a very few minutes after the shooting, were marched to the statehouse. Other circumstances might be mentioned, but it is unnecessary to extend this opinion by setting them out, for it is manifest that the thing had not only been carefully planned, but that it could not have happened as it did except as the result of a well-laid conspiracy.

(3) Was the defendant a party to the conspiracy? Appellant was not in Frankfort at the time of the assassination. He was on the train going to Louisville. If he had been in his office, the shot could not have been fired from it without his being directly involved. His absence at that time gave opportunity for its execution. The assassination was on Tuesday. On the Saturday before, Powers saw Youtsey sitting at the window referred to. He had the window raised six or eight inches, with the curtain down, and with a gun pointed out of the window, and said trouble had started. The witness who testifies to this was the governor's private secretary. He said he did not see any signs of trouble. Youtsey then said if trouble started he was going to be prepared. On the following Monday, appellant, Caleb Powers, and his brother, John, were thinking of going to Louisville. Youtsey asked John

to give him the key to this private office. John gave him the wrong key. The next morning, before Caleb Powers and John started to Louisville, they came to the office, and Youtsey met them in the hall. He had an angry conversation with John, and finally John gave him another key. After this, Caleb and John Powers went to Louisville together. This key Youtsey evidently used to enter this office, raise the window as he had done on Saturday, and lower the blind as it was seen just before the assassination, for he entered through this door, and the door next to the reception room was locked; and he was given this key after he had more than once declared that the way to settle the contest was with steel cartridges, and after appellant knew what had occurred on Saturday. Appellant, on getting to Louisville, took the first train to Frankfort, and, when he got there, jumped off the train while running, in front of the statehouse, instead of going on up to the station, a few squares away, for fear, he says, that he would be arrested there, although no prosecution of any kind had then been begun, and, so far as appears from the record, it was not then definitely known where the shot had come from, as far as he had been informed. A few weeks later he attempted to leave, disguised in a soldier's uniform, with a supposed pardon in his pocket, and a considerable sum of money. Besides this, he is positively connected with the conspiracy by two confessed participants in it, W. H. Culton and F. Wharton Golden—the former a clerk in the auditor's office, and the latter a close friend of appellant, and both men who until then stood well. Culton disbursed large sums of money for appellant, and Golden was intrusted by him with important undertakings. On the 25th of January, or five days before the assassination, appellant organized and brought to the capitol a body of

about 1,000 or 1,400 armed men. Many of these men were of desperate character. Others were members of the State guard, but came with their uniforms concealed. Appellant insists that this crowd was brought to Frankfort on the peaceful mission of petitioning the Legislature. On the other hand, the proof for the Commonwealth tends to show that they were brought here for the purpose of intimidating the Legislature, and that it was contemplated that, if in-timidation failed, members of the Legislature would be killed. It is hard to understand why, if the purpose of this assemblage was peaceful, they should have been brought to the seat of government armed. Not only so, but about this time appellant wrote a letter referring to the London and Williamsburg companies, which he wanted to go with him, and in this he said: "We must have these men and guns. We are undertaking a serious matter, and win we must. Send some one to London and Williamsburg with such orders as will have these two companies join us Wednesday night." On the evening of January 25th the great-er part of the mountain army was sent home, but 200 picked armed men were retained. These men were about the legislative halls and the public buildings from that time until the assassination. Appellant was the admitted leader in all this. He gave Culton the money, and he directed as to the character of men to be brought. His declared object was to intimidate the Legislature, and, in the absence of any proof showing that the killing of members of the Legislature was contemplated, we must know that such a result should be anticipated as the natural outcome of bringing and maintaining a body of desperate, armed men at the seat of government to intimidate them, and that their hostility would be especially directed to the deceased, who was a member of the Senate, and the contestant for the

office of governor.   There is proof that different plans were contemplated, and different members of the Legislature planned to be killed.   In letters written by the defendant, and by word of mouth, he said he was an advocate of open war, and after the assassination of the deceased he declared that the disorganization of the Democratic party was due more to him than to any other man.   He also said that, with Goebel dead, there was no other person who could hold the Democratic party together.   According to all the testimony, appellant was the leading spirit and the director of the armed men brought to the seat of government and kept there for the purpose of intimidating the Legislature from the time they were so brought until the assassination.

Some other details are shown by the evidence, but these need not be noticed.   The material evidence which was admitted, and is held incompetent by this court, will now be considered:

(1) The testimony as to the statements of Leander Guffy.   This evidence simply tended to show that there was a conspiracy to kill the deceased.   It in no way connected the appellant with the conspiracy.   The fact that there was such a conspiracy was abundantly proved by other evidence, and, as this testimony did not connect appellant with the conspiracy, it could not have been prejudicial to him.   Besides, the court instructed the jury, in effect, that the acts and declarations of other persons, not in the presence of the defendant, were competent against him only so far as these persons were members of the conspiracy, and their acts or declarations were in furtherance thereof.   The jury, therefore, could not have considered this testimony, unless they believed from the evidence that the declarant was in the conspiracy.   I do

not think there was any error of the circuit judge in submitting the question to the jury, under the testimony; but, if there was, it could not possibly have prejudiced the appellant.

(2) The testimony of Barlow and Rousseau was competent to impeach the witness Taylor, who had been introduced on behalf of appellant, and testified that he had met appellant in Louisville, by appointment, on the day of the assassination, to consult about bringing a body of men from western Kentucky, and that as soon as they heard of the shooting of Goebel they abandoned their plan. For his statement to these witnesses that "they had got men that would kill the deceased; it is fixed,"—tended to show that he knew that the assassination was to take place before he left home, and that the meeting with appellant was not for the purpose which he assigned. It is shown by the evidence that, just after the assassination, telegrams were sent out, and a large body of militia brought to Frankfort, under the orders of W. S. Taylor, then acting governor of the State, who is indicted as an accomplice of appellant in the assassination, and that these men were brought here to repel any attack that might be made to avenge the death of the deceased. The purpose of appellant's trip to Louisville, and his meeting Taylor there, was a material matter in the case; and the jury were warranted from this evidence in inferring that the witness had not assigned the true reason, but that the body of men proposed to be brought from western Kentucky was aimed for the purpose for which the militia was brought.

(3) What has been said as to the admission of the statements of Leander Guffy applies equally to the statements of J. L. Bosley, as proven by the witness Stivers. This testimony only went to show a conspiracy, and did not

connect the defendant in any way with it. The defendant was not prejudiced by its admission, if the court was in error in submitting this question to the jury, under the proof, which is not perceived.

The other matters referred to in the opinion are too small to be noticed. There are something like 2,500 pages of this record, and when viewed by the side of the evidence heard before the jury, which was clearly competent, the matters objected to, singly, or all taken together, dwindle into insignificance. This court is not warranted in reversing a judgment of conviction unless upon the whole case the substantial rights of the appellant have been prejudiced. In this case, outside of the refusal of the circuit judge to vacate the bench, all the errors complained of may justly be compared to flyspecks on the surface of the shell of a hen's egg. They could not possibly have affected the result, for the only real question in the case was whether the deceased was connected with the conspiracy. The case, therefore, is simply reduced to this: Was the circuit judge right in following the rule laid down unanimously by this court, not only in the last case before it, but in the two preceding cases, which it followed? And if judgments are to be reversed for this, how is justice to be administered?

On the whole case, from an actual reading of the record, I am satisfied that the circuit judge presided at the trial with rare ability and with entire impartiality. I am also satisfied that appellant has had a fair trial, according to the law of the land, and that the evidence warrants the verdict. I therefore dissent from the opinion of the court.

Response by Chief Justice Burnam overruling petition of Commonwealth for rehearing:

Powers v. Commonwealth.  ·(2d Trial.)

(January 20, 1903.)

On the first day of the present January term of this court, The Commonwealth of Kentucky tendered and asked permission to file a petition for rehearing in the case of the Commonwealth of Kentucky against Caleb Powers, charged with murder, which was tried and decided at the last September term of this court. The defendant, by counsel, objects to the filing of this petition, on the ground that there is no authority for such proceeding.

Appeals to this court in felony cases are regulated by section 336 of the Criminal Code, which provides as follows:

"Section 336. An appeal may be taken by the defendant in the following manner only:  (1) The appeal must be prayed during the term at which the judgment is rendered, and the prayer noted on the record in the circuit court. The appeal shall be granted as a matter of right.  (2)' When an appeal is prayed, the court shall, if the defendant desire it, make an order that the execution of the judgment be suspended until the expiration of the period within which the defendant is required to lodge a transcript of the record in the clerk's office of the court of appeals. After the expiration of such period the judgment shall be executed unless the defendant shall have filed in the clerk's office of the court rendering the judgment, the certificate, as provided in sub-section three of this section, that the appeal has been taken, or a copy of the order of the court of appeals granting further time to lodge the transcript. (3) The appeal is taken by lodging in the clerk's office of the court of appeals within sixty days after the judgment, a certified transcript of the record.  The clerk of the

court of appeals shall thereupon issue a certificate that an appeal. has been taken, which shall suspend the execution of the judgment until the decision upon the appeal."

"Section 357. Appeals in criminal cases shall take precedence over all other business of the court and be placed first upon the docket for trial.

"Section 358. They shall stand for trial at the first term ·succeeding the lodging of the transcript in the clerk's office of the court of appeals, provided, it be so lodged ten days before the commencement of the term.

"Section 359. When an appeal by the defendant in a case of felony is lodged within ten days before the commencement of the term, or during the term, it shall stand for trial on the tenth day after it is so lodged.

"Section 360. The appeal shall be decided at the same term at which it is tried."

It will be observed that all these provisions of the Criminal Code look to a speedy trial and decision of felony cases by this court. No provision is made for a rehearing by the defendant, and, except in cases expressly provided for by statute, a rehearing is not a matter of right. But we are of the opinion that this court has, by virtue of its appellate jurisdiction in such cases, power to suspend the issual of the mandate and rehear the case during the term at which it is tried. But, if the power is not exercised during the term, the decision in the case becomes final, and the court has no jurisdiction at a subsequent term to retry the appeal. In Nelson v. Com., 94 Ky., 594, 15 R., 265, 23 S. W., 348, it was decided that section 760 of the Civil Code applied to civil cases only, and, as there was no provision in the Criminal Code for time in which to file a petition for rehearing, that in case of an affirmance of the judgment of conviction

the mandate might issue immediately. The question in that case partly involved the decision of the one before us, and we are of the opinion that this court has no jurisdiction to grant a rehearing in this case at this term of the court.

Motion overruled.