## West v. Commonwealth.

(Decided May 5, 1925 )

### Appeal from Pulaski Circuit Court.

1. Judges—Judge's Refusal to Vacate Bench on Ground of Prejudice Held Error.—In prosecution for breach of peace of one who had led pre-election Ku Klux Klan parade, refusal of judge to vacate bench on motion charging bias and prejudice, both against klan, and defendant individually, held error.
2. Breach of the Peace—Evidence Held Sufficient to go to Jury in Prosecution of Leader of Ku Klux Klan Parade.—Evidence that

police officer, unmasked, led Ku Klux Klan pre-election masked parade in defiance of judicial officers, who had ruled that parade would be breach of peace, and evidence as to display of banner worded, "Who said we cannot march?" held sufficient to go to jury on question whether defendant was guilty of breach of peace.

3. Breach of the Peace—Evidence as to Conference of Peace Officers Held Competent in Prosecution of Leader of Ku Klux Klan Parade, but Certain Details Incompetent.—In prosecuiton of police officer who led Ku Klux Klan pre-election parade, it was competent to show that, before parade, conference of judicial and peace officers was held and conclusion reached that parade would be unlawful and Klan leaders advised accordingly, though recital of what occurred at meeting, and that defendant had there agreed to arrest masked persons parading, was incompetent and prejudicial.

4. Breach of the Peace—Mere March of Masked Persons Not Breach of Peace.—In the absence of a statute or ordinance mere march of persons may not constitute breach of peace. But this depends upon conditions existing at the time and place and the nature, purpose and conduct of the parade.

J. S. LUSCHER and WESLEY & SON for appellant.

FRANK E. DAUGHERTY, Attorney Generl, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

The chief of police of the city of Somerset, Silas West, was convicted of a breach of the peace and fined $100.00. He appeals.

The facts are: A secret order known as the Ku Klux Klan had advertised a meeting for Monday, September 2nd, 1924, at the Pulaski county fair grounds, and for a parade through the principal streets of Somerset that evening.

This order does not divulge the names of its members. In the conduct of its public exercises its votaries are masked with hoods and robes. Its real purposes and objects are matters of speculation among the public and its development created much antagonism, and it had been made an issue in the presidential campaign then in progress.

Sentiment in Somerset was divided and a tense situation existed. Some apprehension was felt by the officials and on Saturday, August 31st, a meeting was held

at the office of the police judge to discuss the matter. This meeting was attended by the circuit judge, county judge, the sheriff and chief of police, the judge of the police court and the mayor of the city. The judicial officers were of the opinion that in the existing state of public feeling a parade of masked persons representing that order upon the principal streets of the city would constitute a breach of the peace and so advised the peace officers present.

It was agreed for the chief of police to notify the leaders of the klan that the authorities would not object to a meeting or to a parade at the fair grounds in the regalia of the order or to an open parade on the streets, but that a masked parade on the streets would be a violation of the law, and the klan was requested to desist from such action. It is also testified that defendant concurred in this and agreed to arrest all masked persons parading the streets.

Judge Kennedy, the circuit judge, attended court at Albany and was not present on the day scheduled for the parade. On that day the klan met at the fair grounds. During the afternoon some three of four masked figures undertook to act as traffic officers at different street intersections. The police judge issued warrants of arrest for these offenders and notified the chief of police, requesting him to call at his office for them. He failed to do so and the warrants were not served.

The parade materialized later in the evening. It consisted of about 175 robed and hooded figures, a few of whom were in autos and on horseback. Floats and banners were also carried. One representing a white mule was emplazoned with the letters "No more, no more." Another, "Farewell, old John Barleycorn," and a banner was worded, "Who said we cannot march?" and conspicuously displayed.

At the head of the parade and without a disguise of any sort rode the defendant, bowing and smiling to the crowd. There was no disorder of any kind, though a feeling of suppressed excitement and apprehension existed, and this caused many of the citizens to retire from the streets and go to their homes, but a large crowd remained and no other untoward incident occurred.

It is claimed for defendant that the leaders had been informed of the result of the conference, but that they were advised by state officials that the parade was lawful. Defendant states that he was accustomed to

head all parades held in the city when requested to do so, and that he did so in this instance upon request, riding in his uniform and being in a position to restrain any disorder that might occur.

West alone was indicted. When his case was called for trial he moved the presiding judge to vacate the bench on the ground of bias and prejudice both against the klan and against him individually. In support of his motion he also filed a lengthy affidavit, accompanied by an excerpt from the judge's charge to the grand jury, which it is alleged was delivered in the presence of the petit jurors.

This charge embraced a bitter and caustic arraignment of the Ku Klux Klan, and a narrative of its organization and conduct much too long to quote. Also it is alleged that he recited in detail all that occurred at the Saturday afternoon conference, and bitterly criticised the defendant West with reference to his conduct, saying that he had violated the agreement reached at the conference and, like Abou Ben Adhem, led all the rest; and singled him out for indictment, intimating that he was a member of the klan and that the punishment should fall upon the leaders and not the members.

The affidavit further charges that Judge Kennedy had in public speeches denounced the klan in similar language and that in impaneling the petit jury for the court then in session had inquired of each juror if he was a member of the K. K. K. and had excused every one who admitted such membership. One juror wished to be excused, but the court refused to grant his request because of his superior qualifications for jury service, but later, upon learning that he was a member of the klan, excused him for that reason. He also made the same inquiry of the officers of the court, and said that, if any of such were members of that order or sympathizers therewith, their services were not needed and they were ordered to stay away and not to come within the bar of the court room.

The court overruled the motion for him to vacate the bench, but continued the case.

At the ensuing term a trial was had. Judge Kennedy and the other judicial officers present detailed all the facts mentioned above as to what occurred at the Saturday afternoon conference, to which the defendant objected and excepted. The defendant testified that at the

conference he agreed to arrest masked paraders only in the event it was shown that such conduct was a violation of the law, but that this was not shown.

(1) On a motion to require the judge to vacate the bench, the facts stated in the affidavit must constitute sufficient grounds to require such action, but in this no counter-affidavit can be filed. Accepting the averments of this affidavit as true we are of the opinion that the judge should have vacated the bench. Stamp v. Commonwealth, 195 Ky. 404; Powers v. Commonwealth, 114 Ky. 237.

(2) It is earnestly argued that the facts stated did not constitute a public offense and that an instruction should have been given to the jury to find the defendant not guilty.

Our court has approved the following definition of breach of the peace as laid down in Cyc., vol. 5, page 1024:

"The term 'breach of the peace' is generic and includes all violations of public peace or order or acts tending to the disturbance thereof. The offense may consist of acts of public turbulence or indecorum in violation of the common peace and quiet, or an invasion of the security and protection which the law affords every citizen, or of acts such as tend to excite violent resentment. Actual personal violence is not an element in the offense, but where the incitement of terror or fear of personal violence is a necessary element, the conduct or language of the wrongdoer must be of a character to induce such condition in a person of ordinary firmness." King v. Commonwealth, 32 L. R. 80; Delk v. Commonwealth, 166 Ky. 39, and in the latter case the following citations are quoted with approval:

"A breach of the peace is a violation of public order or decorum; the offense of disturbing the public peace. By 'peace' is meant the tranquility enjoyed by the citizens of the community where good order reigns among its members." Stewart v. State, 32 L. R. A. (N. S.) 505.

"To lay a foundation for criminal prosecution the peace need not be actually broken. The community is disquieted by any act tending to the breach, of such sort and proximity as to create disturbing apprehensions in the minds of the lookers-on.

Thereon the law interferes and pronounces what is done indictable." Bishop's New Criminal Law, vol. 1, page 539.

By the bill of rights all men are guaranteed "the right of assembling together in a peaceable manner for their common good. . . . " It may be said that a parade or march is but an assemblage in motion, and that under this constitutional provision, citizens may assemble and parade public thoroughfares in an orderly and peaceable manner; and in the absence of a statute or ordinance we are not prepared to say that under ordinary conditions appearing on the streets in disguise is in itself unlawful. The public has long been accustomed to masqueraders on hallowe'en and other occasions, such as mardi gras, etc., and so long as such parties conduct themselves properly and there is no reason to anticipate a disturbance of the peace, their presence upon the streets of a city is not considered a violation of law. But this depends upon conditions existing at the time and place, and the nature, purpose and conduct of the parade. The marchers are chargeable with notice of these matters and assume responsibility for the reasonably probable consequences of the parade. The Ku Klux Klan is popularly understood to antagonize certain religious orders and certain races. So that in addition to existing political differences there existed racial and religious prejudices and a sharp division of opinion among the officers of the law as to the legality of the parade. The leaders of the order were notified that the then judicial officers considered a masked parade on the streets a violation of law and so instructed the peace officers. On the afternoon of the day in question masked riders defiantly and in violation of law undertook to police the streets by acting as traffic directors. Warrants issued for these offenders were ignored by the chief of police. Presumably this was generally known to the public. Within a few hours afterward the masked parade was held, and the banner above referred to worded, "Who says we cannot march?" was conspicuously displayed.

Under all the circumstances this could well be construed as a defiance of the opinion given by the judges. Whatever the intent it was sufficient to provoke an answer and under the circumstances was calculated to arouse violent resentment and retaliation in the opposing party. If instead of the printed words the language quoted had been shouted by the marchers, it must be ad-

mitted that this would have disturbed the onlookers and created a breach of the peace.  It seems to us that the printed language was equally provocative and that under all the circumstances it was for the jury to say whether or not such offense was committed.  As a participant defendant was liable for the conduct of the marchers.  A peremptory instruction was, therefore, properly overruled.

As bearing upon the state of public feeling and the general situation under which the parade was held as well as the significance of the banner carried, it was competent to prove that the Saturday afternoon conference was held and that the leaders of the klan were advised of the conclusions there reached, but a recital of what occurred at that meeting is incompetent and prejudicial.

Standing alone, the first instruction is subject to criticism in not defining a breach of the peace, but such definition is given in the second instruction, and construed together the two fairly present the law of the case.

As the circuit judge will not preside in another trial the question of the propriety of his testifying as a witness will not be raised.

Wherefore, the judgment is reversed and cause remanded for proceedings consistent with this opinion.